Brassard, J.
Introduction
The plaintiff, Nahid Rathore (“Rathore”), brings this action against Jeffery Kelly (“Kelly”); Deaconness-Nashoba Hospital (“Hospital”); Matthew Foley, M.D. (“Foley"), Matthew Foley, M.D., P.C. (“Foley’s Corporation”); and Melvin E. Clouse, M.D. (“Clouse”), and Deaconess Collaborative Radiology (“DCRI”). The plaintiff makes a claim of discrimination in violation of the Massachusetts Equal Rights Act, Mass. Gen. L. ch. 93 §102 (Count II)[1] against Kelly and Foley. Rathore also makes a claim for civil conspiracy (Count III) against all of the defendants. In addition, the plaintiff makes a claim for breach of implied covenant of good faith and fair dealing (Count V) against Clouse and DCRI. The plaintiff alleges tortious interference with a contract (Count IV), defamation (Count VI) and violation of Mass. Gen. L. ch. 93A (Count VII) against Foley and Foley’s Corporation. The Plaintiff alleges cancellation of medical privileges in violation of Hospital bylaws (Count VIII) against Kelly and the Hospital.
The matter is now before the court on Kelly’s, the Hospital’s, Foley’s, Foley’s Corporation’s, Clouse’s and DCRI’s motions for summary judgment pursuant to Mass.R.Civ.P. 56. For the reasons set forth below, Kelly’s and Foley's motions regarding count II are *211 DENIED, the defendants’ motions for summary judgment regarding Count III are DENIED, Foley’s and Foley’s Corporation’s motions for summary judgment regarding Count IV are DENIED, Clouse’s and DCRI’s motion for summary judgment on Count v. are ALLOWED, Foley’s and Foley’s Corporation’s motions for Summary Judgment as to Count VI are DENIED, Foley’s and Foley’s Corporation’s motions for summary judgment on Count VII are ALLOWED, and Kelly’s and the Hospital’s motions for summary judgment concerning Count VIII are DENIED.
BACKGROUND
The following facts are summarized as alleged in the plaintiff s complaint and in the summary judgment record and are viewed in the light most favorable to the non-moving party, in this case, the plaintiff, Rathore. The plaintiff started working at Nashoba Community Hospital (“Nashoba”) in March 1979 and worked for the hospital for eighteen years until 1997. From 1985 until 1993, the plaintiffs professional corporation, Radiology Associates, provided radiology services for Nashoba. Rathore was chief radiologist at Nashoba from 1989 through December 1993. In 1993, Nashoba merged with New England Deaconess Hospital Corporation, (“Deaconess") resulting in the defendant Deaconess-Nashoba Hospital (the “Hospital”). Kelly, the president of Nashoba since 1988, continued as the President of the Hospital. As part of the merger, the Hospital entered into a contract for radiology services with DCRI, founded by Clouse. The Trustees of DCRI were Clouse, Kelly, Foley, and Gaintner (the President of Deaconess). The plaintiff alleges that Clouse received $100,000 from a scheme whereby he had taken 5% of DCRI’s revenues in a procedure that Foley called “tithing.” DCRI employed Rathore and Foley to provide radiology services at the Hospital under successive one-year contracts for which they were both paid identical salaries of $300,000 for the period from June 1, 1993 until September 30, 1996. However, Rathore did not sign the October 1996 employment agreement.
On January 6, 1997, the Hospital gave notice that it would be terminating the contract with DCRI in three months. Both Rathore and Foley were notified that as of April 7, 1997 their services would no longer be required. The Hospital subsequently contracted with Foley’s Corporation for its radiology services. Rathore, who was not an employee of Foley’s Corporation remained a member of the Hospital’s medical staff until her membership was suspended in August 1999.
In 1997, Rathore filed a complaint with the Massachusetts Commission Against Discrimination against all six defendants. In September 1999, Rathore filed the present action. Rathore claims the defendants discriminated against her by demoting her, excluding her from discussions concerning contracts for the provision of future radiology services to the Hospital, and terminating her from the Hospital.
DISCUSSION
This court grants summary judgment where there are no genuine issues of material fact and the summary judgment record entitles the moving party to judgment as a matter of law. Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983), Mass.R.Civ.P. 56(c) (West 2000). The moving party bears the burden of affirmatively demonstrating that there is no genuine issue of material fact on every relevant issue. Pederson v. Time, Inc., 404 Mass. 13, 16-17 (1989). Once the moving parting establishes the absence of a triable issue, the party opposing the motion must respond and allege specific facts establishing the existence of a genuine issue of material fact. See id. The nonmoving party cannot defeat the motion by resting on his or her pleadings and by mere assertions of disputed facts, but must offer admissible evidence to support a finding in that party’s favor. LaLonde v. Eisner, 405 Mass. 207, 209 (1989).
Count II. Violation of Massachusetts Equal Rights Act
Rathore claims that defendants discriminatorily denied her the opportunity to enter into a contract with the Hospital by granting that opportunity solely to Foley without consulting Rathore, without provision for any sort of bidding procedure or making the opportunity available to her. Rathore also asserts that she “made clear” that she wished to continue working at the Hospital and sent “urgent” requests to Kelly for an opportunity to be considered for continued provision of radiology services at the Hospital following the termination of the contract with DCRI. Complaint, para. 30. Furthermore, Rathore claims that Foley did not establish any form of application procedure under which she could formally apply for a job. Rathore also asserts that, in her deposition, she informed both Kelly and Foley that she was willing to work part-time.
Defendants claim that they did not discriminate against Rathore and that no reasonable trier of fact could determine that they chose not to enter into a contract with her for discriminatory reasons. They assert that Rathore never applied for one of the part-time radiologist positions that Foley sought to fill and that Rathore was not interested in part-time work. Accordingly, defendants argue that there was no violation of MERA since Rathore did not formally apply for a position with Foley’s Corporation or with the Hospital.
Defendants also point out that Foley hired a woman and a man for the part-time radiologist positions, and subsequently hired a second woman when the man left, and urge that these hirings evidence no discriminatory, gender-based motive. Defendants further assert that during her deposition, plaintiff admitted that the fact she did not continue to work at the Hospital did not have “anything to do with her national origin.” Rathore Dep. at 215. Moreover, Foley asserts that he had “numerous concerns” about Rathore’s patient *212 care abilities, including mistakes in diagnosis, as well as inflexibility in scheduling and negative feedback from medical staff, which had nothing to do with her sex, race or national origin.
Defendants assert that a 1993 statement made by Foley, in response to Rathore’s question about why he was being unfriendly to her, to the effect that, “you are female, you are from a different ethnic background, you are aggressive and strong-willed, [and] you try to outrace me in reading films,” is not sufficient evidence to create a genuine issue of material fact regarding a discriminatory motive in not hiring Rathore three years later. Defendants argue that remarks tending to suggest animus are insufficient for the purposes of proving an employer’s discriminatory intent.
Rathore, unsurprisingly, argues that “stray remarks” taken alone are sufficient, but claims that the record contains more evidence than Foley’s remark alone. For example, Rathore points to the testimony contained in the affidavit of Ms. Debbie Allen[2] in which Allen testifies that Foley told her that he had been hired for the purpose of ridding the department of Rathore, and that working with her was not his purpose. Allen also testified that Foley sought information which he could use against her in order to eliminate her position or force her to quit. Allen also testified that Clouse and Kelly were involved in his efforts. Rathore also points to the notebook which defendant Foley kept in his office and which contains notes regarding what hours the Plaintiff worked and notes such as, “going to need admin [sic] support because as I squeeze Nahid she may bitch,” and, “how should I handle Nahid?” Rathore also points to the fact that Foley once advocated reducing Rathore’s salary while maintaining his with no reduction despite the greater experience which Rathore had.
General Laws chapter 93, section 102 provides, in pertinent part:
All persons within the commonwealth, regardless of sex, race, color, creed or national origin, shall have, except as is otherwise provided or permitted by law, the same rights enjoyed by white male citizens, to make and enforce contracts, to inherit, purchase, to lease, sell, hold and convey real and personal property, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.
In Greaney v. Heritage Hospital, 4 Mass. L. Rptr. 663, 1995 WL 1146185, at *4, this court (Sosman, J.) engaged in a thorough and complete analysis of MERA and its federal counterpart, 42 U.S.C. §1981.[3] In Greany, this court concluded that in Patterson v. McClean Credit Union, 491 U.S. 164, 176-78 (1989), the Supreme Court of the United States, in construing 42 U.S. C. §102 and §103), held that “rights to make and enforce contracts” included only two work-related rights: (1) the right to enter into an employment contract, and (2) the right to enforce the terms of such employment contract upon termination. Greany, supra, at *4. Patterson involved alleged racial discrimination that occurred on-the-job, and as such, the Court held that 42 U.S.C. §1981 provided no remedy.
Concern about what the Supreme Court might decide in the Patterson case inspired the drafting of MERA. Greaney, supra, at *4. Massachusetts legislators and civil rights lawyers feared that Patterson would overrule the holding of Runyon v. McCrary, 427 U.S. 160 (1976), which had established that 42 U.S. C. §1981 applied to discriminatoxy actions in the private sector. Id. at *4, citing Stephen J. Johnson, The 1989 Massachusetts “Equal Rights Law”: A Short History, 34 B.B.J. 17, 18-19 (March-April 1990). The goal in Massachusetts was to provide a statutory prohibition on discrimination in the private sector in order to preserve the relief that Runyon and its progeny had provided under 42 U.S.C. §1981. Greaney, supra, at *4, citing Stephen J. Johnson, The 1989 Massachusetts “Equal Rights Law”: A Short History, 34 B.B.J. 17, 18-19 (March-April 1990).
The Supreme Court’s holding in Patterson did not overturn Runyon and held that 42 U.S. C. §1981 still applied to private actions. Greaney, supra, at *5. Patterson simply addressed the issue of the interpretation of the term “rights to make and enforce contracts” in the context of claims alleging on-the-job discrimination. Id. at *5.
The Massachusetts Legislature, however, did nothing to change the pending Equal Rights Act’s reference to "rights to make and enforce contracts” to distinguish the Patterson interpretation from the identical language in 42 U.S.C. §1981. Id. at *5, citing Howard v. Town of Burlington, 399 Mass. 585, 589 (1987) (holding that ”[i]n construing Massachusetts statutes, we are ordinarily guided by the construction given the parallel Federal statute by the Federal Courts”). Although G.L.c. 93, §102 was not enacted until one month after the Patterson holding was issued, the legislation did not include explicit language to the effect that MERA would apply to allegations of discrimination in the performance of contracts. Greaney, supra, at *5. The following year, when G.L.c. 93, §103 was enacted, the Legislature still used the identical “make and enforce contracts” language that had already been interpreted by Patterson. Id. at *5. Therefore, since the pending Patterson case had been a major factor motivating the enactment of MERA, the Legislature’s failure to adopt language explicitly expanding the term “make and enforce contracts” is a strong indication that the Legislature did not intend an interpretation other than that rendered by Patterson itself on that same issue. Id. at *5. But see, e.g., Pascucci v. Rocco, C.A. 93-04974 (Mass. Superior Court).
*213 Nonetheless, applying Patterson's limited interpretation of the “make and enforce contracts” language, defendants have failed to affirmatively demonstrate the absence of a triable issue with respect to Rathore’s claim that she was discriminatorily denied the opportunity to enter into a contract. Sufficient evidence easts in the summary judgment record such that defendants are not entitled to judgment as a matter of law. Such evidence includes Foley’s remarks regarding Rathore’s sex and ethnicity, the affidavit of Debbie Allen and the private journal kept by Foley. Defendants’ motions for summary judgment as to Count II are DENIED.
Count III. Civil Conspiracy
Rathore alleges that the defendants engaged in an unlawful conspiracy to terminate her employment at the Hospital and to exclude her from consideration for the radiology contract with the Hospital for discriminatory reasons.
The tort of civil conspiracy can take one of two forms under Massachusetts law: the first, or “coercion” form of conspiracy is rare and appears generally to have been applicable in cases involving direct economic coercion. Massachusetts Laborers’ Health & Welfare Fund v. Phillip Morris et al., 62 F.Sup.2d 236, 244 (D.Mass. 1999). The plaintiff must allege that the defendants had some “peculiar power of coercion” over plaintiff that they would not have had if acting independently. This form of conspiracy is itself a wrong and no other tortious act need be alleged. Id. at 244. The second, or “concerted action” form of conspiracy is a cause of action more similar to a theory of common-law joint liability in tort and depends on proof of an underlying tortious act in which two or more persons acted in concert and in furtherance of a common design or agreement. Aetna Cas. Sur. Co. v. P&B Autobody, 43 F.3d 1546 (1st Cir 1994). This form of conspiracy may extend liability to those who merely assisted in or encouraged the tortious act and does not necessarily require proof of either a power of coercion or of an explicit agreement between defendants. Massachusetts Laborers’ Health & Welfare Fund, supra, at 244; Kyte v. Phillip Morris, Inc., 408 Mass. 162 (1990).
Plaintiff claims that without close coordination among the defendants, Clouse would not have agreed to an early termination of DCRI’s contract, which in turn allowed Foley’s Corporation to enter into the exclusive contract with the Hospital to provide radiology services. Rathore points to the affidavit of Ms. Debbie Allen[4] in which Allen testifies that Foley told her that he had been hired for the purpose of ridding the department of Rathore, and that working with her was not his purpose. Allen also testified that Foley sought information which he could use against her in order to eliminate her position or force her to quit. Allen also testified that Clouse and Kelly were involved in his efforts. Rathore also points to the notebook which defendant Foley kept in his office and which contains notes regarding what hours the Plaintiff worked and notes such as, “going to need admin [sic] support because as I squeeze Nahid she may bitch,” and, “how should I handle Nahid?” Additionally, Rathore points to the date of defendant Clouse’s notice letter, January 6, 1997, which was the same date that Clouse and Kelly agreed to terminate the DCRI contract, as evidence of such coordination.
Foley claims that Rathore has produced no evidence establishing a coercive power over her resulting from the defendants’ concerted actions or establishing evidence of an unlawful common plan to commit a tortious act against Rathore.
While Rathore has not produced evidence of a “peculiar power of coercion,” sufficient to satisfy the “coercion" form of the conspiracy cause of action, she does present circumstantial and other evidence from which a reasonable person might draw an inference of a common plan to commit, assist or encourage a tortious act on the part of two or more of the defendants, namely, the testimony of Debbie Allen and the journal kept by Foley. Additionally, the count in question deals with the existence or nonexistence of a conspiracy, which, “is essentially a factual issue that the jury, not the trial judge, should decide.” Adickes v. S.H. Kress & Company, 398 U.S. 144, 176 (1970) (Black, J. concurring in the judgment). Since, on summary judgment, the inferences to be drawn from the underlying circumstances must be viewed in the light most favorable to the party opposing the motion, defendants’ motions for summary judgment on Count III are hereby DENIED.
Count IV. Intentional Interference with Contractual Relations
In an action for intentional interference with contractual relations, the plaintiff must prove the existence of a contract with a third party; the defendant knowingly induced the third party to break that contract; the defendant’s interference, in addition to being intentional, was improper in motive or means; and the plaintiff was harmed by the defendant’s actions. See Wright v. Shriners Hospital for Crippled Children, 469, 476 (1992), citing G.S. Enterprises, Inc. v. Falmouth Marine, Inc., 410 Mass. 262, 272 (1991). The Supreme Judicial Court has stated that the improper motive or malevolence required is actual malice. King v. Driscoll, 418 Mass. 576, 587 (1994). However, there is no practical difference between “actual malice” and improper motive and means. Harrison v. NetCentric Corp., 433 Mass. 465, 479 (2001). Implied malice is not sufficient. Gram v. Liberty Mutual Insurance Co., 384 Mass. 659, 663 (1981). Courts have defined the requisite malice in this context as a spiteful, malignant purpose unrelated to the legitimate corporate interest of the employer. See Weber v. Community Teamwork, Inc., 434 Mass. 761, 782 (2001); King, 418 Mass. at 587; Boothby v. Texon, Inc., 414 Mass. 468, 487 *214 (1993). To be reasonable, an Inference of malice must be based on probabilities and not mere possibilities. See Gram, 384 Mass. at 663.
Specifically, the courts have found an improper motive where the defendant’s intentional interference with the plaintiffs employment contract was based on unfair age discrimination. See Comey v. Hill, 387 Mass. 11, 19 (1982); Sereni v. Star Sports Wear Manufacturing Corp., 24 Mass.App.Ct. 428, 433 (1987). Likewise, discrimination based on national origin can provide a basis for finding an improper motive. See Abramian v. President and Fellows of Harvard College, 432 Mass. 107, 122 (2000). As to motive, a conclusion that the defendant unlawfully discriminated might, but does not necessarily, support an inference of actual malice. See Weber, 434 Mass. at 782. Furthermore, behavior that comprises improper means includes threats, misrepresentation of facts, and the defaming of the plaintiff. See United Truck Leasing Corp. v. Geltman, 406 Mass. 811, 817 (1990).
On the other hand, personal dislike will not warrant an inference of the requisite ill will. See King, 418 Mass. at 587, citing Boothby, 414 Mass. at 487. Similarly, derogatory comments and uncivil behavior will not warrant the inference that the defendant acted with ill will. See Alba v. Sampson, 44 Mass.App.Ct. 311, 316 (1998). The motivation of personal gain, including financial gain, is also not enough to satisfy the improper interference requirement. United Truck Leasing Corp, 406 Mass. at 817.
In the employment and discharge context, the law of this jurisdiction seeks to protect a corporate official’s freedom of action by requiring proof that the official acted with actual malice. See Alba, 44 Mass.App.Ct. at 315; Gram, 384 Mass. at 663-64. Even with an assumption that the employer replaced the plaintiff with someone less qualified, that hiring decision would not allow the drawing of an inference of malice. See Alba, 44 Mass.App.Ct. at 315. Furthermore, an employer can work to secure an exclusive contract for itself so long as it does not employ wrongful motive or means. See St. Louis v. Baystate Medical Center Inc., 30 Mass.App.Ct. 393, 404 (1991) (holding that a hospital’s chief of anesthesiology had a duty and privilege to express his views about staffing needs, scheduling methods, and administrative structure for his department, and thus, the use of his position to foster administrative policies which had the cumulative effect of terminating one of two anesthesiology groups did not amount to wrongful interference).
Here, the summary judgment record contains evidence that Foley’s actions may have been motivated by more than a dislike of Rathore and that Foley may have possessed the requisite ill will and improper motive necessary to establish an intentional interference claim. See Weber, 434 Mass. at 782; King, 418 Mass. at 587; Boothby, Inc., 414 Mass. at 487. It is undisputed that in 1993, he stated the following to Rathore: “You are female, you are from a different ethnic background, you are aggressive and strong-willed, you try to outrace me in reading films.” In addition to the 1993 statement, there is evidence in the summary judgment record that Foley kept a journal where he acknowledged in his own notes that he intended to “squeeze” Rathore and considered how to “handle her.”
A co-employee, Debbie Allen, also testified in her deposition that after Foley had began work at the Hospital, he confided to her that he had been hired to come in and take over the department and get rid of Rathore. Allen testified that Foley told her that in the same conversation he was going to try and make it look like he worked with Rathore, but in fact that was not his purpose. Allen testified that Foley said that he would lie about it if she ever told anyone about the conversation with him. Allen states further that Foley was seeking her support to provide information to him that he could use against Rathore.
It is undisputed that Foley suggested to Clouse that he should end the contract between DCRI and the Hospital. It is undisputed that Foley met with Kelly and told him his concerns about Rathore’s ability as a radiologist. Specifically, in February 1997, Foley told Kelly that Rathore would not provide radiology services other than on a full-time basis, that she was unreasonably inflexible with respect to scheduling and that she failed to participate actively to support quality assessment efforts.
This evidence may provide a jury with a basis to find that Foley had an improper motive when he allegedly interfered with the contract between Rathore and DCRI. See King, 418 Mass. at 587. For this reason, this case is different than Serení where the plaintiff based the tortious interference claim on his belief that the defendant was biased against persons over the age of forty especially those who were Jewish. See 24 Mass.App.Ct. at 433. There, unlike here, the most that the plaintiff could muster in his supporting affidavit was that he believed age and ethnic bias to have been the cause of his undoing. See id. As a result of the lack of evidence, the Court granted summary judgment for the defendant. See id. Here, on the other hand, there is evidence from which a jury could conclude that Foley possessed a spiteful, malignant purpose that was unrelated to a legitimate corporate interest. See Weber, 434 Mass. at 782; King, 418 Mass. at 587; Boothby, Inc. 414 Mass. at 487.
Foley argues that to the extent that this claim is rooted in his 1993 statement to Rathore, it is barred by the three-year statute of limitations for tort actions. See Mass. Gen. Laws ch. 260, §2A. However, in Massachusetts, under the three-year statute of limitations, causes of actions in tort generally accrue at the time the plaintiff is injured. See Stark v. Advanced Magnetics, Inc., 50 Mass.App.Ct. 226, 333 (2000). Here, Rathore was not injured until Foley allegedly *215 tortiously interfered with her contract for radiology services in late 1996-and 1997. The 1993 comment could not place Rathore on notice that the tort of intentional interference with a contract would be committed against her in the future. See Stark, 50 Mass.App.Ct. at 333. Therefore, Rathore’s claim is not barred by the statute of limitations. Foley’s and Foley’s Corporation’s motions for summary judgment regarding Count IV are DENIED.
Count V. Implied Covenant of Good Faith and Fair Dealing
In the Commonwealth, there is a general requirement that parties to contracts and commercial transactions must act in good faith toward one another. Fortune v. National Cash Register Co., 373 Mass. 96, 102 (1977). In the employment situation, a contract that is “at will” may be terminated for any reason, but there is an implied covenant between the parties to act with good faith. See id. Our cases indicate that a plaintiff generally does not have an enforceable claim for a “bad faith” termination of an at-will employment contract unless the employee can show that (1) the discharge resulted from the defendant’s intent to benefit financially at the plaintiffs expense, such as for the purpose of retaining for itself sales commission or pension benefits which would otherwise be due to the plaintiff; Siles v. Travenol Labs., Inc., 13 Mass.App.Ct. 354, 358 (1982); see Maddaloni v. Western Mass. Bus Lines, 386 Mass. 877, 884 (1982); Fortune, 373 Mass. at 102; or (2) the employer’s reason for discharge was contrary to public policy; Siles, 13 Mass.App.Ct. at 358; see Cort v. Bristol-Myers Co., 385 Mass. 300, 302 (1982); Gram, 384 Mass. at 668.
The obligation of good faith and fair dealing imposed on an employer requires that the employer may not discharge an employee to avoid the payment of commissions based on past services or to reap for itself financial benefits due its employees. See Maddaloni, 386 Mass. at 884; Gram, 384 Mass at 672. For example, in Gerald Rosen Co., Inc. v. International Telephone and Telephone Co., there was no evidence of any anticipated, measurable future compensation based on past services to which the plaintiff was entitled, and for this reason, there was a judgment for the defendant. See 16 Mass.App.Ct. 929, 929 (1983).
The implied covenant of good faith and fair dealing is also breached when the termination violated public policy. See Smith-Pfeffer v. Superintendent of the Walter E. Fernald State School, 404 Mass at 145, 149 (1989). The public policy exception, however, is quite narrow. See Mitchell v. TAC Technical Services, Inc., 50 Mass.App.Ct. 90, 93 (2000). An employee must be able to point to some clearly defined and well-established public policy that is threatened by the employer’s action. Glaz v. Ralston Purina Co., 24 Mass.App.Ct. 386, 390 (1987). That would be the case if the termination were in retaliation for performing an important and socially desirable act, exercising a statutory right, or refusing to commit an illegal act. Id. The degree of intrusion on the rights of the employee is important. See Cort, 385 Mass. at 308. For example, the public policy exception makes redress available to employees who are terminated for asserting a legal right (e.g. filing a workers’ compensation claim), for doing what the law requires (e.g. serving on a jury), or refusing to commit perjury. Upton v. JWP Businessland, 425 Mass. 756, 757 (1997). However, public policy considerations do not justify the imposition of liability upon the employer for discharge of employees at will merely because it gave a false reason or a pretext for their discharge. See Cort, 385 Mass. at 306.
The issue whether there was a public policy violation is a question of law for the judge, and not for the jury. See Mello v. Stop & Shop Companies, 402 Mass. 555, 561 (1988). In deciding whether there has been a public policy violation, courts recognize that internal policy decisions are a matter of judgment for those entrusted with decision making within the institution. See Smith-Pfeffer, 404 Mass. at 151. Courts do not question the general principle that an employer is entitled to be motivated by and to serve its own legitimate business interests; they recognize the employer’s need for a large amount of control over its work force. See Fortune, 373 Mass. at 102.
Here, it is undisputed that Rathore did not sign the October 1996 employment agreement, and thus, she was an employee at will. There is no evidence that DCRI or Clouse owed Rathore any salary for past services. Thus, this situation is different than the Gram case where the employee lost reasonably ascertainable future compensation based on past services. See 384 Mass. at 672. It is also different than the Fortune case where the employer discharged an employee to deprive him of commissions already earned but not yet payable. See 373 Mass. at 105. In both of those cases, there was loss of compensation that was clearly related to an employee’s past service, and as a result, the plaintiffs in each case were able to establish that there was a breach of the implied covenant of good faith and fair dealing. See Gram 384 Mass. at 672; Fortune, 373 Mass. at 105.
Here, on the other hand, as in Gerald Rosen Co., there is no evidence of any anticipated, measurable future compensation based on past services to which Rathore is entitled. See 16 Mass. App.Ct. 929. The plaintiff alleges that Clouse received $100,000 from a “scheme” whereby he had taken out 5% of DCRI’s revenues in a procedure that Foley called “tithing” and that Clouse regarded as “standard.” Rathore states further that when Clouse and DCRI obtained the scheme’s benefits, Clouse ended DCRI’s contract with the Hospital, leaving Foley in charge at the Hospital and leaving Rathore without employment. Even if these allegations are established, there is no evidence that any of this money was owed to Rathore and there is no evidence that Clouse owed Rathore any salary *216 for her past services. See Maddaloni, 386 Mass. at 884; Gram, 384 Mass at 672. Therefore, there is no evidence from which a jury could reasonably conclude that Clouse sought improperly to benefit financially at Rathore’s expense. See Siles, 13 Mass.App.Ct. at 358.
Furthermore, Rathore also cannot establish that Clouse breached the covenant of good faith and fair dealing based on public policy considerations. See Smith-Pfeffer, 404 Mass at 151. There is no evidence in the summary judgment record that Clouse terminated the DCRI contract with Rathore in retaliation for Rathore performing an important and socially desirable act, exercising a statutory right, or refusing to commit an unlawful act. See Glaz, 24 Mass.App.Ct. at 390. Rathore urges that Clouse and Foley had a plan to oust Rathore from the Radiology Department. However, Rathore does not point to any clearly defined and well-established public policy that was threatened by the employer’s action. See id. Furthermore, Clouse’s decision to end the DCRI contract was an internal policy decision of Clouse and DCRI. See Smith-Pfeffer, 404 Mass at 151. Thus, Rathore cannot establish that Clouse violated a public policy when he decided to end the DCRI contract with the Hospital.
For the foregoing reasons, Clouse’s and DCRI’s motion for summary judgment on Count v. is ALLOWED.
Count VI. Defamation
The statute of limitations for defamation in Massachusetts is three years. Mass. Gen. Laws ch. 260, §4. The general rule under Massachusetts law regarding libel and defamation cases is that the cause of action accrues and the statutory period begins to run on the date of publication. Collins v. Nuzzo, 244 F.3d 246 (C.A. 1 Mass 2001); Flynn v. Associated Press, 401 Mass. 776, 781 (1988). Under Massachusetts law, the discovery rule suspends the running of the statute of limitations where a cause of action is based on an “inherently unknowable” wrong. Catrone v. Thoroughbred Racing Associations of North America, Inc., 929 F.2d 881, 885 (1991). The statute only starts to run when the harm becomes known, or in the exercise of reasonable diligence should have become known, to the injured party. See Flynn, 401 Mass. at 781.
Here, in this case, it is undisputed that Foley made allegedly defamatory statements in 1994, but Rathore did not bring this cause of action until 1999. The plaintiff, however, argues that the 1994 comments are still actionable. Rathore relies on cases from outside of Massachusetts, which hold that where the complaint alleges that all of the slanderous statements published by the defendants were committed in furtherance of a conspiracy to defame plaintiff, the statute of limitations will not begin to run until there is a cessation of the wrongful acts committed. See Schessler v. Keck, 125 Cal.App.2nd 827, 832 (1954); Annot., When Does Statute of Limitations Begin to Run Against Civil Action for Conspiracy, 62 A.L.R. 2nd 1369, at §15; see also Auld v. Mobay Chemical Co., 300 F.Sup. 138, 141 (W.D.Pa. 1969) (holding that an action based on conspiracy to defame, which was subject to a one-year statute of limitation period governing defamation, was not subject to dismissal on basis of running of limitations statute where some of the alleged defamatory remarks were made within one year of filing of complaint).
Even if the Supreme Judicial Court were to follow the holding from Schessler, the situation here is different, and thus, the California case law is not applicable to Rathore’s claim. See 125 Cal.App.2d at 832. In Schessler, the plaintiffs complaint included the claim that the allegedly defamatory statements that were made beyond the statute of limitations were a part of the defendant’s conspiracy to defame the plaintiff. See id. Here, on the other hand, Rathore’s complaint includes allegations that Foley made defamatory statements in 1994, but does not allege that they were made as part of a conspiracy. In Rathore’s complaint, the first mention of facts relevant to an alleged conspiracy are from 1996 when Rathore contends that Clouse, Foley and Kelly engaged in secret conversations concerning the future of radiology services at the Hospital. Likewise, there is nothing in the summary judgment record suggesting the existence of a conspiracy in 1994. Therefore, this situation is different than Schessler where the plaintiff did allege that the defamatory statements made beyond the statute were part of an ongoing conspiracy. Accordingly, the holding from Schessler even if adopted by the Supreme Judicial court is not applicable here. See id.
In this case, the 1994 memorandum and letter written by Foley are beyond the statute of limitations because in Massachusetts the cause of action accrues and the statutoiy period begins to run on the date of publication. See Collins, 244 F.3d at 253; Flynn, 401 Mass. at 781. Also, Rathore was aware of the letter and memorandum in 1994, and thus, the defamatory comments were not inherently unknowable. See Catrone, 929 F.2d 881 at 885. Rathore did not file her complaint for this present cause of action until 1999, and because of the three-year statute of limitations, Foley’s alleged defamatory comments made in 1994 are barred.
To prevail on a claim for defamation, Rathore must show that Foley published to one or more third parties a statement of fact of or concerning the plaintiff; that such a statement was defamatory in the sense that it would hold the plaintiff up to hatred, scorn or ridicule among a considerable and respectable segment of the community; that the defendant acted with at least some degree of negligence; and that the statement caused actual harm to the plaintiffs reputation. Winsmann v. Choate Health Management, Inc., 2002 WL 1290209 (Mass. Super. 2002); see McAvoy v. Shufrin, 401 Mass. 593, 597 (1988); Stone v. Essex *217 County Newspaper, Inc., 367 Mass. 849, 858 (1975). Imputation of criminal conduct is defamation per se. Draghetti v. Chmielewski, 416 Mass. 808, 812 (1994).
Statements of opinion are constitutionally protected and thus are not actionable. Friedman v. Boston Broadcasters, Inc., 402 Mass. 376, 379 (1988); Battenfeld v. Harvard University, 1 Mass. L. Rptr. 75, 1993 WL 818920 1, 5 (Mass.Super. 1993). To distinguish between actionable statements of fact and non-actionable statements of opinion, the court must examine the statement in its totality in the context in which it was uttered or published. See Lyons v. Globe Newspaper, Co., 415 Mass. 258, 263 (1993). If the statement unambiguously constitutes either fact or opinion, this issue is a question of law for the court to decide. Id. A simple expression'of opinion based on disclosed or assumed non-defamatory facts is not itself sufficient for an action of defamation, no matter how unjustified and unreasonable the opinion maybe or how derogatory it maybe. Id. Specifically, whether a person’s work product is considered satisfactory, and statements as to whether a co-worker is incompetent, uncooperative, and unproductive are matters of opinion. See Battenfeld, 1 Mass. L. Rptr. 75, 1993 WL 818920 at 5.
With this court’s conclusion that Foley’s 1994 statements are barred, the remaining issue is whether the 1997 comments made by Foley to Kelly could be considered defamatory. In February of 1997, Foley reported to Kelly that Rathore had not met reasonable expectations in the areas of scheduling flexibility, active participation and support of quality assessment efforts and collegial communication. In viewing the facts most favorable to the plaintiff, Foley also told Kelly that Rathore would not provide radiology services other than on a full-time basis. Here, Foley’s 1997 comment made to Kelly regarding Rathore’s scheduling flexibility, her participation in quality assessment efforts, and her collegial communication are opinions. They are not actionable because a simple expression of opinion based on disclosed or an assumed non-defamatory fact is not itself sufficient for an action of defamation, no matter how unjustified and unreasonable the opinion may be or how derogatory it maybe. See Lyons, 415 Mass. at 262. Likewise, the statements are not actionable because whether an employee is incompetent, uncooperative, or unproductive and whether the employee’s work product is considered satisfactory are matters of opinion. See Battenfeld, 1 Mass. L. Rptr. 75, 1993 WL 818920 at 5. However, Foley’s statement to Kelly relating to Rathore’s willingness to work full time is a purported fact and thus could be actionable under the defamation claim if Foley does not have a conditional privilege. See Foley v. Polaroid Corp., 400 Mass. 82, 94 (1987).
An employer has a conditional privilege to disclose defamatory information concerning an employee when the publication is reasonably necessary to serve the employer’s legitimate interest in the fitness of an employee to perform his or her job and is reasonably related to legitimate business interests. Foley, 400 Mass. at 94 (quoting Bratt v. International Business Machine Corporation, 392, Mass. 508, 509 (1984)). A qualified privilege exists where the publisher and the recipient have a common interest and the communication is of a kind reasonably calculated to protect or further it. See Foley, 400 Mass. at 95 (quoting Sheehan v. Tobin, 326 Mass. 185, 190-91 (1950)); see also Mullen v. Ludlow Hospital Society, 32 Mass.App.Ct. 968, 970 (1992) (summary judgment affirmed when the defendant employer had a privilege to publish information about the plaintiff in evaluating his work within the hospital and he did not publish the information excessively).
Once a defendant has established the existence of a qualified privilege to publish or write the defamatory statement, the plaintiff has the burden of showing that the defendant abused that privilege. Foley, 400 Mass. at 94. The privilege is also lost if there is unnecessary, unreasonable, or excessive publication. Mulgrew v. City of Taunton, 410 Mass. 631, 634 (1991); Tosti v. Ayik, 386 Mass. 721, 726 (1982). Furthermore, the plaintiff can also establish that the defendant abused the privilege if the plaintiff can show that the defendant acted with actual malice. Tosti, 386 Mass. at 726. Malice has been stated to require evidence of an improper motive. Hartmann v. Boston Herald-Traveler Corp., 323 Mass. 56, 59 (1948). One manner of such abuse is publication with knowledge of falsity or with reckless disregard of the truth. Tosti, 386 Mass. at 726.
In this case, Foley and Kelly had a common interest: hiring a radiologist who would work for Foley’s corporation and for Kelly’s hospital. See Bratt, 392 Mass. at 513. Foley’s comment regarding Rathore’s work preferences was reasonably related to furthering such an interest. See id. Therefore, Foley did have a conditional privilege to disclose defamatory information. See id.
Given that Foley had a conditional privilege to publish a defamatory statement, the burden shifts to Rathore to establish that the defendant has abused the privilege through unnecessary, unreasonable, or excessive publication, or alternatively, to establish that the defendant acted with actual malice. See Mulgrew, 410 Mass. at 634; Foley, 400 Mass at 94; Tosti, 386 Mass. at 726. Here, Rathore cannot meet her burden of showing that Foley spread the information through unnecessary, unreasonable, or excessive publication because the 1997 statement was conveyed only to Kelly, the president of the Hospital and the person who made hiring decisions and who shared an interest in the performance of doctors delivering medical services at the Hospital. See Mulgrew, at 10 Mass. at 634.
On the other hand, there is evidence in the summary judgment record that Foley may have acted with actual malice and thus abused his conditional privilege. See Tosti, 386 Mass. at 726. First, whether Foley *218 acted with reckless disregard of the truth is an issue of material fact because it is disputed whether Rathore would work full time. See id. Furthermore, there is evidence in the summary judgment record that Foley may have had an improper motive when he made his alleged defamatory comment to Kelly. See Hartmann, 323 Mass. at 59. For example, his 1993 comment to Rathore regarding her ethnic background (see above), his journal entries and his conversation with Debbie Allen are evidence of possible improper motive. Whether these comments constituted actual malice is a question for the jury, and thus, it is for the jury to decide whether Foley abused his conditional privilege. Accordingly, Foley’s and Foley’s Corporation’s motion for summary judgment as to Count VI is DENIED.
Count VII. Violation of G.L.c. 93A
In order to show a violation of Section 11 of Chapter 93A, Rathore must prove that (I) she has suffered a loss of money or property, real or personal; (2) that this loss is a result of an unfair or deceptive act or practice; and (3) that this act or practice was perpetrated by one who engages in the conduct of trade or commerce. Birbiglia v. St. Vincent Hospital, 3 Mass. L. Rptr. 407, 1994 WL 878836 at 5 (Mass.Super. 2000); G.L.c. 93A, §11. The Supreme Judicial Court in Manning v. Zuckerman held that the unfair or deceptive acts prohibited are those that may arise in dealings between discrete, independent business entities, and not those that may occur within a single entity. 388 Mass. 8, 10 (1982). Section 11 embraces marketplace transactions, not claims arising from the ordinarily cooperative circumstances of the employment relationship. See id. at 13. The statute does not cover employment contract disputes between employers and employees who work in the employer’s organization, nor to disputes between members of that organization arising out of the employment relationship. See id. The Manning rule has been applied to several situations involving relationships similar to the employer/employee relationship and that concern primarily private, intra-entity disputes. 45 Mass. Prac. Employment Law §5.45 (2002); see also Newton v. Moffie, 13 Mass.App.Ct. 462, 469 (1982).
For example, in St. Louis v. Baystate Medical Center Inc., the Court held that Chapter 93A does not apply to a dispute between a physician and a hospital as to the physician’s privileges at the hospital because it is an intra-enterprise dispute. See 30 Mass.App.Ct. at 404. However, the Court held that the plaintiff s Chapter 93A claim could be brought against a group of physicians competing against the plaintiff to provide anesthesiology services at the hospital. See id.; see also Newton, 13 Mass.App.Ct. at 469 (holding that a private transaction between individual members of the same partnership is not actionable where the transaction affects only the partners themselves and does not affect, either directly or indirectly, the interests of the public, other businessmen, or competitors).
Furthermore, acts that occur after the employment relationship has ended are also barred under the Manning rule. For example, in Informix v. Rennell, the Court stated that it is without consequence that the plaintiff was no longer the defendant’s employer when he acted in disregard of the contract. See 41 Mass.App.Ct. 161, 163 (1997). There, the Court held that any claim arising from the employment relationship was not actionable under c. 93A; the Court held that Manning imposed no limitation that the employment relationship be ongoing. See id.
For the purposes of summary judgment, therefore, the question is whether Rathore’s ch. 93A claim arises out of a dispute between discrete, independent business entities, or between an employer and employee. See Sargent v. Tenaska, Inc. 914 F.Sup. 722, 731 (D.Mass. 1996). Rathore did not work for Foley, as the doctors were co-employees at DCRI and were not in an employer-employee relationship. Though both Foley and Rathore worked at DCRI, her complaint did not arise out of that narrow employment context. Nevertheless, the present dispute did arise from their connection and employment with the Hospital. Therefore, based on the broad interpretation of the Manning rule that precludes claims arising “out of the employment relationship,” Rathore’s claim based on Chapter 93A is not actionable. Accordingly, Foley’s and Foley’s Corporation’s motion for summary judgment as to Count VII is ALLOWED.
Count VIII. Hospital Bylaws
Count VIII is based on Rathore’s allegation that the Hospital breached a contract with her by terminating her clinical medical staff privileges without a hearing in violation of the Hospital bylaws. It is undisputed that Kelly wrote to Rathore in a April 3, 1997 letter “you have no further rights to employment at the Hospital as of April 8, 1997.” In the same letter he wrote, “with respect to your clinical privileges, it is our understanding that you agreed with DCRI that such privileges would be coterminous with your employment with DCRI and its agreement with the Hospital.” However, there are material facts in dispute regarding Rathore’s privileges at the Hospital. Specifically, whether Rathore’s privileges were in fact terminated and when this alleged termination occurred are in dispute. For this reason, summary judgment is not appropriate and accordingly, Kelly’s and the Hospital’s motion is DENIED.

The Court previously granted Defendants’ motion for Summary Judgment on Count 1 of the Plaintiffs Complaint, in which the Plaintiff alleged that all of the Defendants discriminated against her in violation of M.G.L.ch. 151B.

The facts are taken from Ms. Allen’s Second Affidavit.

The analysis by Justice Sosman with respect to this issue is adopted in the instant case.

The facts are taken from Ms. Allen’s Second Affidavit.